NEW YORK SEVEN-UP BOTTLING CO., INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1672–66.    Filed May 29, 1968.

*Robert A. Maloney* and *George A. Donohue,* for the petitioner.
*Jay J. Lander* and *James Q. Smith,* for the respondent.

FAY, *Judge:* Respondent determined a deficiency of $19,124.01 in petitioner's income tax for the taxable year 1960.

Petitioner conceded all the issues raised in the pleadings except one. The issue left for decision is whether section 404(a)(5)[1] prohibits petitioner from deducting in its taxable year 1960 the sum of $36,776.95 which it accrued on its books as a liability for severance pay under a union contract or, in the alternative, if section 404(a)(5) does not prohibit petitioner from taking said deduction, whether it is entitled to the deduction under sections 162 and 446. During the trial and on brief, petitioner raised the procedural issue of whether respondent should bear the burden of proof with respect to the above-described alternative issue.

### FINDINGS OF FACT

Some of the facts were stipulated. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

Petitioner is a corporation organized under the laws of Illinois. It is an accrual basis taxpayer with a fiscal taxable year ending on March 31. It filed its Federal corporate income tax return for the taxable year 1960 with the district director of internal revenue, Manhattan District, New York. Its principal place of business was New Rochelle, N.Y., when it filed its petition in this case.

Petitioner is in the business of bottling and distributing soft drinks in the New York area. It operates a bottling plant in the Borough of the Bronx in New York City (hereinafter referred to as the Bronx plant) and another plant in New Rochelle, N.Y.

Petitioner has two categories of employees at its Bronx plant—production men and driver-salesmen. Production men work inside the bottling plant. They operate the production line which begins with empty bottles and ends with cases of bottled drinks stacked on pallets ready for shipment. Driver-salesmen work outside the plant. They distribute bottled drinks to and collect empty bottles from purchasers on various routes.

Because some of the tasks along the production line are more strenuous than others, production men rotate from job to job at 30-minute intervals. The most strenuous task on the production line is stacking cases of filled botles on pallets to prepare them for shipment. The stacking man removes cases by hand from a conveyor belt which is about 2 feet from the floor and stacks them on a pallet. The cases are sometimes stacked seven high. The cases vary in weight from about 35 to 50 pounds each. On a normal day, a stacking man handles slightly over 300 cases in his 30-minute stint.

---

[1] All statutory references are to the Internal Revenue Code of 1954.

The work of driver-salesmen is also strenuous at times. The most strenuous task is removing cases of filled bottles from the truck and putting them where the purchaser wants them. When possible, drivers use a two-wheeled dolly to accomplish this. They stack the cases vertically on the dolly and wheel them as close as possible to the place where the purchaser wants them. This often involves maneuvering the dolly up and down steps, curbs, and other obstacles. Sometimes it is not possible to use a dolly. In these cases, the driver must carry the cases. He often carries one in each hand to save time.

The annual turnover rate in the work force at the Bronx plant is usually between 20 and 30 percent. Some people are usually on sick leave at any given time, sometimes with back troubles. Some of the employees wear back supporters while they work.

The collective-bargaining agent for the employees at the Bronx plant was, during the period of time relevant to the issue herein, the Soft Drink Workers Union, Local 812 (hereinafter referred to as local 812). Leo Greenfield, an attorney, represented local 812 in its negotiations with petitioner at all times relevant to the issue herein.

Petitioner entered into its first collective-bargaining agreement (hereinafter referred to as union contract) with local 812 in 1950 after a prolonged strike. Petitioner and local 812 entered into new union contracts on July 2, 1952, and July 2, 1954. The latter contract was effective until May 31, 1956. None of the union contracts which were in effect up to that date contained any provision for severance pay.

On September 12, 1956, petitioner and local 812 entered into a union contract which was effective from June 1, 1956, to May 31, 1959. The contract contained the following provision:

### Article XXXVIII

#### Severance Pay

After five (5) years continous [sic] service any employee who voluntarily resigns or who is discharged for reasons other than dishonesty or drunkenness shall be entitled to severance pay. Severance pay shall amount to one (1) weeks pay for each year of service, commencing with the first year of service, with appropriate adjustment for less than a full year. A week's pay for purposes of the severance allowance shall be computed at the weekly rate prevailing at the time of the employee's severance. * * *

The severance-pay provision in the 1956 contract was the result of many years of effort by the leadership of local 812. As early as 1949, the leadership of local 812 began to agitate in various bottling plants to establish a pension or retirement plan run by local 812 with money contributed by employers. The local 812 negotiators first broached the subject to petitioner during the 1956 contract talks. Petitioner did not want to go along with the retirement plan because it would entail yearly contributions to a trust set up by local 812. As a compromise,

petitioner offered to put a severance-pay clause in the new union contract, provided the clause would not require a yearly setting aside of a particular fund. Petitioner offered to set the yearly accretion to the severance-pay account of each employee at a figure which would roughly equal the contribution which local 812 was asking it to make annually on behalf of each employee to the retirement plan.

The members of local 812 accepted the severance-pay compromise. Prior to 1956, an employee of petitioner whose job terminated received his regular pay up to the time of termination, plus earned vacation pay. If he was disabled, he received $30 per week for 26 weeks under an insurance plan provided by petitioner. He was also entitled to unemployment benefits from the State of New York under certain circumstances. At the union meetings in connection with the 1956 contract negotiations, some employees of the Bronx plant expressed a desire for some sort of additional payment to help tide them over in the event that they had to leave petitioner's employment for medical or other reasons and seek a new job. These desires were relayed to petitioner by the local 812 negotiators during the talks leading up to the 1956 contract.

On September 24, 1959, petitioner and local 812 entered into a union contract which was effective from June 1, 1959, to May 31, 1962. The contract contained the following provisions:

### Article XXXVIII

#### Severance Pay

After five (5) years continuous service any employee who voluntarily resigns or who is discharged for reasons other than dishonesty or drunkenness shall be entitled to severance pay. Severance pay shall amount to one (1) week's pay for each year of service, commencing with the first year of service, with appropriate adjustment for less than a full year. A week's pay for purposes of the severance allowance shall be computed at the weekly rate prevailing at the time of the employee's severance. * * *

1. Credit for service shall be given for time in military service or on disability.

2. If any employee entitled to severance pay dies his allowance shall be paid to his beneficiary under the Group Life Insurance Policy.

3. For employees who by June 1, 1959, have attained five (5) years or more service, their severance pay allowance above described shall be frozen as of that date and shall not continue to be accumulated beyond that date. The amount so frozen shall be payable upon termination of employment as above described. For employees who by June 1, 1959 have not attained at least five (5) years of service, but who remain in the service of the Company until they have attained five (5) years of service the severance pay allowance above described shall be frozen as of the date of attainment of five (5) years service and shall not continue to be accumulated beyond that date. The amount so frozen shall be payable upon termination of employment as above-described.

4. The severance benefits provided for in this Article XXXVIII shall not apply to any employee hired after May 31, 1959.

The 1959 contract also provided for contributions by petitioner to the local 812 retirement fund, as follows:

ARTICLE XXXIX

Standard Retirement Clause

Effective June 1, 1959, Employer shall contribute five cents ($.05) per hour for each hour actually worked by each employee, including temporary employees and employees on trial period, up to forty (40) hours per week, to the trustees of the Soft Drink Workers Union, Local 812, Retirement Fund.

The provisions in the 1959 contract with respect to severance-pay and retirement-plan contributions were the result of the long-standing efforts, described above, of the leadership of local 812 to establish an industry-wide union retirement plan. When the time came in 1959 to negotiate a new union contract with petitioner, the leadership of local 812 was determined to have petitioner contribute to the union retirement plan. The 1959 contract talks were very stormy, with some workers going out on strike. One result of the talks was that the leadership of local 812 finally succeeded in getting petitioner to contribute to the union retirement plan. In order to achieve this, the leadership and the members of local 812 were willing to give up future severance-pay benefits, provided the benefits accumulated up to 1959 would be frozen as of that date.

Of the 41 employees who attained 5 years of service by May 31, 1959, 15 had received severance payments by the time of the trial herein. Of the 15, 2 retired, 2 were fired, 3 were transferred to other departments, 2 died, and 6 resigned. Of the 19 employees who were employed on May 31, 1959, and attained 5 years of service thereafter, 7 had received severance payments by the time of the trial herein. Of the 7, 5 resigned, 1 of whom resigned for ill health, and 2 received payments because they became participants in petitioner's profit-sharing trust.

At all times prior to its fiscal year ending on March 31, 1960, the year here in issue, petitioner deducted severance pay only when actually paid. On its Federal income tax return for the fiscal year ending on March 31, 1960, petitioner deducted $36,776.95 for unpaid severance-pay liability. It claimed the deduction on the theory that the liability accrued in 1959 when its severance-pay liabilities were frozen. Petitioner did not, prior to or during its fiscal year ending on March 31, 1960, pay out to a fund, place in a trust, or otherwise segregate from the general funds of its business any part of the claimed $36,776.95 severance-pay liability.

In his statutory notice of deficiency for the taxable year ending on March 31, 1960, respondent disallowed petitioner's claimed severance-pay deduction of $36,776.95. He did so on the theory that the deduction is prohibited by section 404(a)(5) and that it is not otherwise allowable under any provision of the Internal Revenue Code of 1954.

The first issue for decision is whether section 404(a)(5)[2] prohibits petitioner's deduction in the taxable year 1960 of the sum of $36,776.95 as severance-pay liability. The parties do not dispute that if the severance-pay provision is within the ambit of section 404(a), section 404(a)(5) prohibits the deduction in issue. Thus, the narrow question is whether section 404(a) applies to the severance-pay provision.

Petitioner does not deny that its severance pay is compensation. Nor does it deny that its severance-pay provision is a plan which defers the receipt of compensation.[3] Thus, petitioner's claimed deduction appears to fit squarely within the coverage of the statute as "compensation * * * accrued on account of a[n] employee under a plan deferring the receipt of such compensation."

In what appears to be the primary theory of its case, petitioner argues that section 404(a) does not apply to every type of deferred compensation. Section 404(a), petitioner continues, only applies to arrangements which provide retirement benefits for the employee. Petitioner contends that neither it nor local 812 intended the severance-pay provision to be a retirement benefit. Petitioner therefore concludes that section 404(a) does not apply to the severance-pay provision.

We do not need to decide whether petitioner's severance-pay provision is a retirement benefit, because we do not agree with the argument that section 404(a) only applies to retirement plans. While it is true that section 404(a) can apply to a plan which provides retirement benefits,[4] it does not follow, that it applies only to such plans. Indeed petitioner has not pointed to and we have not found any requirement that a plan, in order to come within section 404(a), must

---

[2] SEC. 404. DEDUCTION FOR CONTRIBUTIONS OF AN EMPLOYER TO AN EMPLOYEES' TRUST OR ANNUITY PLAN AND COMPENSATION UNDER A DEFERRED-PAYMENT PLAN.

(a) GENERAL RULE.—If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing, or annuity plan, or if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation shall not be deductible under section 162 (relating to trade or business expenses) or section 212 (relating to expenses for the production of income) but if they satisfy the conditions of either of such sections, they shall be deductible under this section, subject, however, to the following limitations as to the amounts deductible in any year:

　　*　　　*　　　*　　　*　　　*　　　*　　　*

(5) OTHER PLANS.—In the taxable year when paid, * * * if the employees' rights to or derived from such employer's contribution or such compensation are nonforfeitable at the time the contribution or compensation is paid.

[3] At one point in its reply brief, petitioner asserts that its severance pay is not "deferred compensation." In view of the context in which the assertion appears, however, it must be read as an argument that the severance pay in question is not the type of deferred compensation to which sec. 404(a) applies. Furthermore, at another point in its reply brief, petitioner indicates that its severance pay *is* deferred compensation.

[4] See *New York Post Corporation*, 40 T.C. 882, 888–889 (1963) ; *Sol Jacobs, Jr.*, 45 T.C. 133, 135 (1965). See also H. Rept. No. 2333, 77th Cong., 2d Sess., pp. 50–51 (1942), 1942–2 C.B. 372.

withhold all benefits until the employee's final retirement.[5] It follows that petitioner's main theory is untenable.

Petitioner also argues that the regulations promulgated under section 404(a) exclude the severance-pay provision from the operation of that section. The pertinent part of the regulations is as follows:

Sec. 1.404(a)–1 Contributions of an employer to an employees' trust or annuity plan and compensation under a deferred payment plan; general rule.

(a)(1) Section 404(a) prescribes limitations upon deductions for amounts contributed by an employer under a pension, annuity, stock bonus, or profit-sharing plan, or under any plan of deferred compensation. * * *

(2) Section 404(a) does not apply to a plan which does not defer the receipt of compensation. Furthermore, section 404(a) does not apply to deductions for contributions under a plan which is solely a dismissal wage or unemployment benefit plan, or a sickness, accident, hospitalization, medical expense, recreation, welfare, or similar benefit plan, or a combination thereof. For example, if under a plan an employer contributes 5 percent of each employee's compensation per month to a fund out of which employees who are laid off will be paid benefits for temporary periods, but employees who are not laid off have no rights to the funds, such a plan is an unemployment benefit plan, and the deductibility of the contributions to it is determined under section 162. * * *

(3) If, however, the contributions to a pension, profit-sharing, stock bonus, or other plan of deferred compensation can be used to provide any of the benefits referred to in subparagraph (2) of this paragraph, then, except as provided in section 404(c), section 404(a) applies to the entire contribution to the plan. Thus, if in the example described in subparagraph (2) of this paragraph, the employer's contribution on behalf of each employee is set up as a separate account, and if any amount which remains in an employee's account at the time of retirement is paid to him at such time, the deductibility of the contributions to the plan is determined under section 404(a). * * *

In its argument, petitioner concentrates on the second sentence of subparagraph (2). Petitioner claims that its severance-pay provision is a combination of a dismissal wage plan, an unemployment benefit plan, and a welfare or similar benefit plan. It concludes that the second sentence of subparagraph (2) keeps the severance-pay provision out of section 404(a).

The difficulty with this argument is that it overlooks subparagraph (3) of the regulation, which qualifies subparagraph (2). The types of plan listed in subparagraph (2) provide benefits only to those participants under a plan who qualify for them. The example in subparagraph (2) emphasizes this point. The rule of subparagraph (3), as we read it, is that a plan which assures *some* benefit to every participant is not within subparagraph (2), even if the plan also provides one or more subparagraph (2) benefits to participants who qualify for them. This rule is emphasized in the example in subpara-

---

[5] For a contrary indication, see the definition of "profit-sharing plan" in Income Tax Regs., sec. 1.401–1(b)(1)(ii).

graph (3). Thus, even if we were to assume that petitioner's severance-pay provision is a combination dismissal wage plan, unemployment benefit plan, and welfare or similar benefit plan it is not within subparagraph (2). Because the severance-pay provision assures some benefit, that is, a week's pay for every year of service up to the cutoff point, to every participating employee, that is, every employee who had 5 years of service by June 1, 1959, or who was employed on June 1, 1959, and who later completed 5 years of service, subparagraph (3) prevents the provision from coming within subparagraph (2).

Petitioner also argues that section 404(a) only applies to pension, profit-sharing, stock bonus, annuity, and similar plans. It argues further that the severance-pay provision is not a plan of the type enumerated. It concludes that the severance-pay provision is not within the ambit of section 404(a).

We do not agree. This argument does not give full effect to the portion of section 404(a) which provides: "if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation." These lines are not limited to plans which are similar to pension, stock bonus, profit-sharing, and annuity plans. Cf. Income Tax Regs. sec. 1.404(a)–1(a)(1). The only language in section 404 which has a ring similar to petitioner's argument is in section 404(b).[6] That section, however, deals with situations where there is no formal plan of deferred compensation, a circumstance which is not present in this case.

Finally, petitioner makes an argument, which it raises for the first time in its reply brief, based upon an analogy to Income Tax Regs. section 1.162–10(a).[7] Upon considering the entire regulation in the perspective of the issue raised herein, we conclude that petitioner's argument is without merit.

We conclude that section 404(a) applies to petitioner's severance-pay provision. It follows that section 404(a)(5) prohibits petitioner from deducting the sum of $36,776.95 as severance pay in its taxable year 1960 because the sum was not "paid" in that year.

---

[6] Sec. 404(b). METHOD OF CONTRIBUTIONS, ETC., HAVING THE EFFECT OF A PLAN.—If there is no plan but a method of employer contributions or compensation has the effect of a stock bonus, pension, profit-sharing, or annuity plan, or similar plan deferring the receipt of compensation, subsection (a) shall apply as if there were such a plan.

[7] Sec. 1.162–10  Certain employee benefits.

(a) *In general.* * * * Amounts paid or accrued within the taxable year for dismissal wages, unemployment benefits, guaranteed annual wages, vacations, or a sickness, accident, hospitalization, medical expense, recreational, welfare, or similar benefit plan, are deductible under section 162(a) if they are ordinary and necessary expenses of the trade or business. However, * * * such amounts shall not be deductible under section 162(a) if, under any circumstances, they may be used to provide benefits under a stock bonus, pension, annuity, profit-sharing, or other deferred compensation plan of the type referred to in section 404(a). In such an event, the extent to which these amounts are deductible from gross income shall be governed by the provisions of section 404 and the regulations issued thereunder.

Because of our disposition of the first issue, it is not necessary for us to deal with the alternative issue raised herein. Furthermore, it is not necessary for us to deal with the procedural issue raised in connection with the alternative substantive issue.

*Decision will be entered for the respondent.*